IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION

UNITED STATES OF AMERICA : CASE NO.
:
v. :
:
:
MURRAY ROJAS : 1:15-CR-00169

TRANSCRIPT OF PROCEEDINGS
SENTENCING

Held before the HONORABLE SYLVIA H. RAMBO
May 6, 2019, commencing at 9:34 a.m.
Courtroom No. 3, Federal Building, Harrisburg, Pennsylvania

APPEARANCES:

WILLIAM A. BEHE, ESQUIRE
United States Attorney's Office
228 Walnut Street, Suite 220
Harrisburg, PA 17108
For the United States

ROBERT E. GOLDMAN, ESQUIRE
Robert E. Goldman LLC
527 Hamilton Street
Allentown, PA 18101
For the Defendant

WILLIAM GOTTLIEB, U.S. PROBATION OFFICER

Proceedings recorded by machine shorthand; transcript produced by computer aided transcription.

---

Wendy C. Yinger, RMR, CRR
Official Court Reporter
wendy_yinger@pamd.uscourts.gov

(Conference held in chambers:)

THE COURT: I understand you requested this.

MR. GOLDMAN: No. I said to Mr. Behe, he was standing up at the bar of the court, and I said to him, I expect that this is going to take some time.

THE COURT: Okay.

MR. GOLDMAN: And that instead of standing, I just asked permission to be sitting at counsel table.

THE COURT: That's fine. Well, we can do it here, unless you prefer it out in the public.

MR. GOLDMAN: The sentencing, Your Honor?

THE COURT: Yes. Do you want to have it out in the open court?

MR. GOLDMAN: Yeah, I think it has to be.

THE COURT: All right. Sorry, it was my understanding you requested this. We'll go out. We'll be right out.

(Conference in chambers concluded at 9:35 a.m.)

(Proceedings reconvened in open court at 9:40 a.m.)

THE COURT: Good morning, everyone. Mr. Behe, call your case.

MR. BEHE: Yes, Your Honor. May it please the Court, this is the time and place set for sentencing in the matter of the United States of America versus Murray Rojas, which is at this court's criminal docket number 15-CR-169. The record

should reflect that Mrs. Rojas is present in court with counsel. And as I said, this is the time and place set by the Court for sentencing in this matter, and we're proposed to proceed.

THE COURT: First of all, Mrs. Rojas, have you reviewed the pre-sentence report with your counsel?

THE DEFENDANT: Yes.

THE COURT: There have been some objections initially filed to the report. One was the use of the United States Sentencing Guideline Section 2B1.1. And the Court will sustain that finding. It relies on two cases out of the First Circuit, *United States versus Almedia*, 710 Fed.3d 437, and *United States versus Ihenacho*, 716 Fed.3d 266. So with that ruling on the base offense level, that is the Court's position with regard to that. Now there was also an objection to the loss amount.

MR. BEHE: Your Honor, did I understand you to overrule the objection or sustain?

THE COURT: I overruled the objections based on those two cases.

MR. GOLDMAN: Your Honor?

THE COURT: Yes.

MR. GOLDMAN: Can we deal with one at a time?

THE COURT: I'm making a ruling now on --

MR. GOLDMAN: Yeah, I want to present evidence in that regard before you make a ruling.

THE COURT: Isn't it a little late?

MR. GOLDMAN: No, not at all. We're entitled at a sentencing hearing to present evidence in support of our objections to the pre-sentence report.

MR. BEHE: But in this particular case, Your Honor, there was an objection. There was a finding by the probation office, and Your Honor made a ruling. Their objection is preserved. And unless there was something in addition to it that was not submitted to probation, I don't know that this is the proper time.

THE COURT: You can take an appeal on that issue.

MR. GOLDMAN: Okay. I just want to make a statement on the record for appellate purposes because I have to preserve this.

THE COURT: Go ahead.

MR. GOLDMAN: I wanted to present transcripts of the Government cooperating veterinarians who have stated that all the decisions as to the false representations, being the vet treatment sheets to the racing commission and the billing records that went out, was all by them without participation or knowledge by Ms. Rojas.

And our contention at the time of sentencing is, under the law, in order to show an intent to defraud, you have to show that Murray Rojas was involved in a conspiracy to misrepresent or to commit a fraud. And there's no evidence.

In fact, the evidence established at trial by the Government's own witnesses verify that this was a separate conspiracy committed by the veterinarians.

Based on that, there is no evidence to substantiate the felony conviction, and she shouldn't be sentenced to a guideline range that starts at two and a half years, because without that evidence, it should be a zero to six. I'm prepared to quote from the transcripts. If the Court precludes me from doing so, I can't -- I'll take it up on appeal.

THE COURT: Mr. Behe.

MR. BEHE: I agree that's the place to take it up. It's part of the trial record. The transcripts are available. Nothing is new, it's all there. The Court has heard it and ruled on it.

MR. GOLDMAN: I would ask the Court to state on the record for appellate purposes what is the misrepresentations or fraud that the Court is relying on to make this a felony conviction as opposed to a misdemeanor conviction?

THE COURT: First of all, the jury made findings of fraud in the verdict slip.

MR. GOLDMAN: Yeah, but that should not be controlling because there is no evidence to substantiate that. That should have been vacated after the verdict. The Court has a duty to make an independent finding of whether or not that jury finding is supported in the record.

THE COURT: Why did you not bring this up earlier?

MR. GOLDMAN: We have brought this up. We have brought this up. And we stated in our sentencing memo -- this is the first time in all my years doing federal law that we do a sentencing memorandum that raises all of this, cites to the record, and the Government submits no counter-statement in that regard.

And further, and further, this Court found in its last opinion that there is a distinction between dispensing a drug and administering a drug. The Court then found that in sustaining the misbranding conviction, the Court found there is evidence in this case that the veterinarians dispensed drugs to Murray Rojas and then used those drugs which were dispensed to her to administer them to the horses.

There is no evidence in the record that supports that. And given that, the misbranding violation should be vacated at this time before sentencing. I challenged the Government to find anywhere in the record -- because it is their Brady obligation to state to this Court that your finding has no basis on the record -- I challenged them to present that in advance of the sentencing.

They did not respond to that. And so our statement goes uncontested that the Court's decision that the drugs that were dispensed to Murray Rojas were then administered has no support in the record. So I've raised all these, Your Honor.

I can't help it if the Government doesn't join in our objections and show where we're wrong in the record.

And with that, I don't see how this Court can, one, sentence Ms. Rojas on the misbranding convictions; and for purposes of sentencing, there is no evidence to support a felony sentencing in this case.

MR. BEHE: Your Honor, first, I would start, as Your Honor did, with the verdict, not just on the specific findings of fraud, but the Count 21 alleged criminal conspiracy with the objects of those co-conspirators, including the Defendant, to perpetrate a fraud and discussed how the co-conspirators engaged in conduct that constituted fraud and deception to carry out this misbranding scheme.

So you don't have to look any further than the jury's conviction in Count 21 of the criminal conspiracy where the objects of the conspiracy and the manner and means were specifically spelled out.

Secondly, the record fully supports it. There was a motion to dismiss the indictment, a Rule 29 motion, a second Rule 29 motion. Your Honor's ruled on it. This isn't -- it's a fundamental misunderstanding of what Brady is. There's nothing been concealed from anybody. This case has been fully tried. Everything is on the record.

The allegation is Your Honor just doesn't understand the record and that you didn't hear the testimony that was

presented. I don't join in that, of course. Everybody understands what was presented. It's clear without question that the vets testified that the Defendant ordered these drugs and had the vets administer these drugs to them. It's a violation of the statute.

And on their end, made sure that the co-conspirators, including the Defendant, weren't caught by engaging in conduct that concealed their criminal acts by back-dating the records and submitting to the Department of Agriculture these vet records. This is not the third Rule 29 reconsideration motion, this is the time set for sentencing, and Your Honor has already ruled on this point.

MR. GOLDMAN: Your Honor, one last statement. The conspiracy to present the false documents was a conspiracy just joined in by the veterinarians. All the veterinarians, each of them testified, and I have citations to the record, if the Court is interested in that, to say that they did that. They never sent her one of these vet treatment sheets, for example. They never discussed these sheets with her. And so she's not part of that fraud conspiracy.

That fraud conspiracy is limited to Korte, Motta, and Brophy, and their confederates, but not to this Defendant. And you can't enhance the sentencing to a felony unless there's evidence that shows she joined in that part of the fraud. A mere violation of a state regulation is not fraudulent conduct.

There must be more.

We cited and I assume the Court read our law in our sentencing memoranda. They have to show that she was aware of the misrepresentations and she went along with them or she participated in the misrepresentations. And there's zero evidence. In fact, it's stronger than zero evidence because the people who did it said that she was not involved in that and was not aware of that. And because of that, she cannot be sentenced to a felony.

MR. BEHE: Your Honor, the law of conspiracy is quite clear that co-conspirators are responsible for the conduct of the other members of the conspiracy if it's something that's reasonably foreseeable as part of the conspiracy. In this case where they are talking about illegally administering drugs to horses on race day, concealment is clearly something that would be contemplated by the parties in this case. That the vets would do something is a reasonably foreseeable consequence in this case. And the jury's finding, again, was that this was committed by fraud.

MR. GOLDMAN: It's not me, it's the Government that doesn't understand conspiracy.

THE COURT: I stand by my ruling, and I support the findings of the pre-sentence report. Mr. Goldman, do you have other arguments you wish to make?

MR. GOLDMAN: Well, we still have other objections,

Your Honor.

THE COURT: The one objection was the amount of the loss. There was no objection to the memo of Mr. Behe of January 9, 2019, despite efforts by this Court to contact counsel as to what his position was. So the Court accepts the loss as stated in the January 9th, 2019, letter, from Mr. Behe to the Court.

MR. GOLDMAN: I don't understand. I want to make argument on the loss.

THE COURT: Go ahead.

MR. GOLDMAN: There was no evidence whatsoever presented at trial that Murray Rojas received any of the proceeds from the race, number one. Number two, there was no evidence that the administration of any drugs resulted in any of the purses being won. In fact, there is no evidence whatsoever that these were performance enhancing drugs. As a matter of fact, the Government prevented us, and you prevented us, from showing that these were not performance enhancing drugs.

And so based upon their failure to show any money going to Murray Rojas, they failed to call any owners to say that the owners were unaware of the administration of the drugs, and that they were in any way affected, there was no evidence presented in this court to support any of that.

The Penn National has a per se rule that's published

to all the public that says if any of the races are overturned as a result of any violation, your winnings or your losses are not going to be changed as a result of that. The betting public knows that, and so there is no victim here. There are no losses proven by the Government in this case. And the loss amount is not proper in this case.

THE COURT: Mr. Behe.

MR. BEHE: Yes, Your Honor. It doesn't matter whether Mrs. Rojas pocketed a dime from this. The fact that she, through this illegal activity, trained and raced horses for other individuals won the purse money as a result of having her horse entered when it should have been disqualified deprived other contestants of that money and benefited whoever the owner was of that horse and the purse proceeds were thus distributed.

She gets her percentage. But whether she got the entire purse or some of the purse or none of the purse, the fact that she won it and it was distributed to others by running horses that should have been disqualified and never entered at all establishes the loss. It's gain as well that can be considered under 2B1.1, gain of others.

MR. GOLDMAN: Let me give you an example, Your Honor, why a mere violation does not result in a loss. There's other rules and regulations; for example, that jockeys must wear a certain, you know, type of colors or a silk or whatever. Now

if they're in violation of any of those violations, they per se should not be racing.

But those violations don't show that those violations caused the winning of the race. The administration of therapeutic drugs in this case, non-performance enhancing drugs in this case, there's no evidence resulted in her winning the race. The Government's argument is merely in this case that the mere violation dictates that these losses should be awarded. There's no support. The burden is on them. There's no support on those dollar figures.

THE COURT: The Third Circuit will have to figure this one out. I've made my ruling. I'd like to have you discuss the Brady. I know it was mixed in with your first argument. But do you want to give me your argument on failure to provide Brady material?

MR. GOLDMAN: Yes, Your Honor. Your Honor, in your last ruling, the memorandum on our motion to vacate the misbranding, we had been raising for the past two years the argument that the terms dispense and administer are separate and apart. The Government has used them interchangeably stating that they mean the same thing in spite of the United States Supreme Court in an earlier case saying that these terms have separate and distinct meanings.

The Court in its memorandum, in the final memorandum, agreed with us that the terms dispense and administer do have

separate and distinct meanings. But the Court denied the motion to vacate the misbranding statute on the basis of there's evidence in this case that the vets dispensed, that the vets dispensing is that they sell her drugs for her own use. So you said that was evidence of dispensing. And in some instances, for her own use, they dispensed.

I have horses. They dispense to me. That doesn't make a violation. The Court found that there was a violation that after the dispensing, they then used those drugs to administer to horses. And because of that, the Court found that there is misbranding. There was dispensing to her and then using those drugs to administer.

There is no evidence whatsoever in the record that supports what the Government -- I'm sorry, what Your Honor found. Mr. Behe knows that. Brady violations occur when the Government is aware of something that's material to the issues at sentencing. There could be nothing more profound for this sentencing that the Court's basis for upholding the misbranding is based on a misinterpretation or misreading or misperception of the facts. The Government knows that.

The Government has the affirmative duty to either show in the record that we're wrong or advise the Court that you misperceived those facts. Failure to do so is a Brady violation. So that Brady violation will stand and will affect this entire sentencing because we wouldn't even be here for a

sentencing if the Court had not misperceived the facts. And the Government knows.

I have been trying by telephone, e-mail, letter, and sentencing memorandum, and also in the motion to reconsider your findings to get the Government to show where we're wrong or to admit that we're right. They can't be silent. A Brady obligation is an affirmative duty. A prosecutor cannot sit and standby while my client gets sentenced for misbranding based upon a misperception of the facts by this Court. That's the Brady violation.

MR. BEHE: That isn't Brady.

MR. GOLDMAN: It is Brady.

MR. BEHE: That isn't Brady. Brady stands for the concealment of exculpatory evidence by the Government -- do you mind?

MR. GOLDMAN: I'm not saying anything.

MR. BEHE: It stands for the concealment of exculpatory evidence by the Government. The record is clear in this case. There's nothing that the Government kept out of the record. There's nothing that's exculpatory that we kept from the Defendant. The Defendant just disagrees with Your Honor's well-reasoned review of the evidence and the interpretation of the law and is expecting me to tell you that you're wrong when you adopt our viewpoint.

And we agree with you. You sat through the trial.

You heard the evidence in this case. Your Honor said specifically that there is no temporal requirement here that the dispensing and the administering occur, you know, at certain times. The fact that she purchased them and had them administering is the dispensing. Your Honor ruled in this matter. There is no --

THE COURT: Twice.

MR. BEHE: Yes. And with regards to the particular allegation that it's a Brady violation, that's just a misunderstanding of Brady. I saw the case out of the Western District that's cited throughout the Defendant's sentencing memorandum. That just is a case where the prosecutor withheld information, withheld information concerning their view of the credibility or lack of credibility of one of their key witnesses, failed to indicate that they weren't going to call that witness.

It was just a horrible record of concealing evidence that the Court disciplined the prosecutor for there. There is no such withholding of evidence in this case. He disagrees -- the defense disagrees with you. That's what the appellate court will rule on.

MR. GOLDMAN: We're going to sentencing now, Your Honor, with no citation to the record by the Court or the Government for the notion that she purchased drugs and then those drugs were used -- those drugs were used to administer to

horses. It doesn't exist in the record. I've read the record three, four times. It appears nowhere in the record. So it's a misperception by the Court.

The evidence here is, in a light most favorable to the Government, is that Murray Rojas had the vets administer drugs and then sometime in the future she was billed for those services. That's administering as opposed to dispensing. The Court made the factual finding that the drugs were first dispensed to her and then those exact drugs were used to administer to the horses. It doesn't exist in the record. The Government knows that. That's a Brady violation. That's a concealment.

If I'm wrong on that, have them point out to you, Your Honor. I mean, this is a woman with no prior criminal record that's now going to be sentenced by you to a potentially extraordinary long period of time who's innocent of these offenses and innocent because there is no support to the Court's factual findings.

That's material to sentencing. It isn't victory or, you know, you don't just, you know, check off, I got another Defendant, or, we convicted a trainer. That's not the role of a prosecutor.

The role of a prosecutor is to seek justice not victory. And in this case, justice is telling you, Your Honor, that factually, you're wrong on that finding. And it's not

cited by you, and it's not cited by Mr. Behe anywhere that your factual findings are correct. And I'm stating to you in reading this record thoroughly and multiple times, there's no evidence to support your factual findings.

THE COURT: I'll let the Third Circuit make that decision. Any other arguments that you wish to make because I do have some other questions?

MR. GOLDMAN: I'm sorry, Your Honor?

THE COURT: I said, do you have any other arguments? But I have some questions that I need to ask you.

MR. GOLDMAN: Yeah, that's fine, Your Honor. Next question.

THE COURT: All right. You say she should be charged with a misdemeanor as the veterinarians have apparently been charged, correct?

MR. GOLDMAN: No, I'm saying she should be charged with a misdemeanor based upon the failure to show the necessary elements to make it a felony not on the mere --

THE COURT: But you say it's a disparity between the treatment to the vets and her treatment?

MR. GOLDMAN: Yeah, that's a separate argument.

THE COURT: Well, I want to hear your argument on that.

MR. GOLDMAN: Right, okay. The disparity in this case is this. The Government started this case four years ago

with serving 10 target letters on trainers, advising me that after those 10 were convicted, there would now be 40 trainers who would ultimately be charged in this case with violations.

What happened in this case, based upon this trial and their theory of this case, you know, going to Hell during this trial, the United States Attorney's Office has decided to bring no additional charges against any trainers, just leaving Murray Rojas as the scapegoat in this case. The trainers in this case, the Government will make -- I'm sorry, the veterinarians in this case -- oh, they also shopped this case to the Attorney General's office.

After their office decided, we're not going to go to with this case anymore in federal court, they attempted to get the Attorney General's office to bring state prosecutions. Attorney General's office said, we don't want to have anything to do with that. Leaving her again as the sole scapegoat in this case.

The veterinarians have committed the administration of drugs thousands of more times than it's alleged that Ms. Rojas did. And in those cases, the interesting thing is, and the Court may recall, they're given a misdemeanor plea. I'm sure you'll say, and the Government will say, they cooperated. Yes, they cooperated.

They were able, with the Government, to keep all their ill-gotten gains, all their proceeds, which was hundreds

of thousands of dollars -- it's in the record, I read that last night -- up to potentially a million dollars. Brophy, Motta, and Korte could keep all that. And their sentencing just keeps being pushed down the road.

Now the Government contends there's no plea agreement as far as what their sentence is going to be. Now you know, Your Honor, and I know, and Mr. Behe knows, these people are going to get probation at the end of the day. They've been out here now for at least four years, still practicing their trade. We established that at the time of trial that, I believe it was Motta, even when he's kicked off at Penn National, is selling horse drugs out of his truck right at the gates with trainers coming in and trainers going out.

So when we're talking about disparity, yeah, there's a significant disparity in this case. The significant disparity here is -- the jury recognized there's no fraud in this case. They threw out the mail fraud and wire fraud counts. But the disparity in this case is the lone woman who stands up to the Government and says, I'm not guilty of these offenses, I'm legally not guilty of these offenses, is now facing two and a half to, what, three and a half years, while the perpetrators of the crime, the veterinarians, get probation, get a misdemeanor plea. And all those 40 trainers that were going to get charged are still racing at Penn National.

That's a disparity. That's a disparity. And that should be taken into consideration by this Court as far as a variance is concerned on what should happen to Murray Rojas when no one, even the main evil people in this, you know, keep their money, don't go to jail, keep their profession. Murray Rojas, Your Honor, she lost -- she was kicked off the track, you know, the day of the verdict.

Her husband was kicked off the track for being a husband the day of the verdict. It took us a year to go up to the Commonwealth Court and get that reversed. And then we went to the hearing because we wanted now to be vindicated that her husband had no right to be kicked off the track, and you know what happened? Penn National withdrew their claim.

Eddie Rojas, her husband, lost all of his stalls, all of his stables at Penn National. He lost all that income for a year or two while we took it up to the Commonwealth Court. And they're impoverished. Yeah, there's a sentencing disparity here.

THE COURT: Mr. Behe.

MR. BEHE: Yes, Your Honor. I cannot predict what sentence the veterinarians will get in this case, but I can honestly tell the Court I will be recommending that my office consider a 5K1 motion. Their guidelines far exceed what the statutory maximum, I believe, is in these offenses. But it's comparing apples and oranges to try and put the Defendant in

the same position as the veterinarians.

I don't believe Ms. Rojas had any money taken from her. None of her purses were required to be returned in this case. The vets have been barred from the racetracks as well. They just haven't had their license taken away because until they are sentenced in the Commonwealth, it's not considered to be a conviction.

But they cooperated before they were even charged. They sat down with the United States, reviewed their records to explain everything that was going on. It's an extraordinary example of cooperation with the United States. In essence, each one of them was like the Rosetta Stone. They were able to take records and translate them for us, for the investigators, where they would otherwise not be able to do so because of the way of the back-dating and the coding of the bills and the submission of the false reports to the racing commission.

Yes, they are in different situations. And yes, they substantially assisted the United States in this case by coming in well before charges were brought against them, and the charge against them was a negotiated one in light of their cooperation to allow them to plead guilty to that offense without making it a three-year felony because of their substantial pre-charge cooperation with the Government.

Crimes have consequences. And if that's what happened to Ms. Rojas, and collaterally to her husband, that

was rectified when they withdrew it, that's a consequence of engaging in this criminal activity.

MR. GOLDMAN: One thing I neglected, Your Honor, if I could just supplement. Crimes have consequences. Stephanie Beattie, who is a far worse example of administering drugs to horses, is a Government witness, not charged whatsoever. Bridgette Poe, who went with Motta and Korte and Brophy to administer drugs, and she administered drugs, not charged in this. Cynthia Deaven, who also was involved, in fact involved in preparing false veterinarian reports, not charged in this case.

So when we're talking about a disparity, you certainly have a right for variance purposes to take into consideration how Murray Rojas is being treated. And mind you, Your Honor, she didn't take the stand and commit -- no one can argue that she falsely testified in this case. She is standing on the fact that she didn't commit this crime legally. And that will be, you know, that will be sustained by the Third Circuit, I'm certain of that.

But she's being sentenced now because she had the gall or the gumption of being, you know, in this case a woman who says, I'm not guilty of this, I'm not guilty of this. And all the other people actually gained as a result of her strong stand. All those other trainers who were going to be indicted and convicted of a felony, if the Government had their way, are

still racing at the racetrack.

I mean, she was the one, the woman who put her finger in the dam and showed that this was a bad faulty prosecution by the Government. And now what? We throw her into prison? Cinder block walls for years? Leaving her five daughters to fend for themselves while her husband Eddie tries to repair the business that the Government took away from him, that Penn National took away from him? Where's the justice in that?

THE COURT: I'll listen to any other arguments that you have that we haven't covered.

MR. GOLDMAN: Yes. I wanted -- if you have the objections in front of you, I said that the -- it's improper for -- the probation office is to do an independent evaluation of the evidence. They presented a one-sided view, which was the Government's view, of the evidence in this case. In paragraph 5, which is my second objection --

THE COURT: Where?

MR. GOLDMAN: Paragraph 5.

THE COURT: Are you reading from your --

MR. GOLDMAN: I'm reading from my objections, Your Honor, my written objections to Ms. Baker-Dowd. I started with saying, it's not proper to simply rely upon the information provided by the Assistant United States Attorney.

MR. BEHE: Page 5 or paragraph 5?

MR. GOLDMAN: Paragraph 5. If we're looking for a

fair and independent evaluation, which I'm sure the Court would agree is the requirement of the probation office, they should have contacted me for a counter-statement of the evidence presented at trial. And what I did in my July 2nd, 2018, letter to Ms. Baker-Dowd was to state that the counter-statement by the defense should be added.

And I say, the PSR should include the following recitation. Then I go on for a page, at least a page and a half, of saying what the evidence shows in this case. And that should be added to the pre-sentence report.

I made other arguments regarding paragraph 9, paragraph 11, paragraph 12, paragraph 14, 15, 16, 17, 23, 24, 42, 49. I made arguments on sentencing in 56, 61. And I requested changes on 63. I believe the law requires the Court to make a finding on each of those on whether or not we're permitted to have the pre-sentence report amended to include that information.

THE COURT: Mr. Behe.

MR. BEHE: Your Honor, I think by filing these objections, his objections are already part of the record.

THE COURT: They're attached to the record.

MR. BEHE: So that, I think, takes care of that.

THE COURT: Anything further, Mr. Goldman?

MR. GOLDMAN: No, Your Honor.

THE COURT: Pardon?

MR. GOLDMAN: Not on that, Your Honor.

THE COURT: Anything else?

MR. GOLDMAN: On the objections or argument?

THE COURT: Anything you wish to argue?

MR. GOLDMAN: Pardon me?

THE COURT: Anything you wish to argue?

MR. GOLDMAN: Yes, thank you, Your Honor. Your Honor, sentencing argument. Your Honor, you certainly are aware that the dictates of the Third Circuit as well as all courts in this United States is that the Court should impose a sentence that's no greater than necessary to attain the goals of sentencing. And you just -- the sentencing guidelines is merely a starting point for what the appropriate sentence is.

And the Court is supposed to, in determining whether a variance should be granted in this case, is to look at and consider Murray Rojas as an individual. And in this case, we have she's 53 years old at this time with no prior criminal record. She's got a great family, five daughters that are present in the courtroom and a husband. And as I just noted before, they have suffered serious repercussions of her conviction.

She's lost one love of her life, which is her training of race horses. She's lost that, and no one else has lost that in this case. She has lost income. She's lost her ability to be an income earner in her family. And this

conviction has turned her family's finances upside down. As I told you, Eddie Rojas, for being married to this woman, lost his stalls, which is right down the street from his farm. They have never given them back to him.

He now has to travel -- he's not here today because he's out in another state or another part of this country trying to make ends meet for this family. Their family has been destroyed financially by this case, let alone by the conviction.

And that is a consideration when you're deciding what kind of penalty. What kind of message is that? I'll tell you right now, there's not one trainer in this country that will say, I'll trade places with Murray Rojas. She's been the poster child. In the Paulick Report, in all the horse racing things, she's been branded as being a person, incorrectly, that she's using performance enhancing drugs. She's been vilified in the racing industry.

And now she's trying to make ends meet by working or opening up, you know, a soft ice cream stand. How humiliating is that for a woman that was talented in this profession? So when you are looking at this case, Your Honor, you take a look, as I said before, what's happened to the other people; what's happened to the people who just took the easy way out, pled to misbranding counts which might not be sustainable; got a pass by the Government, you know, when they were even more of a

serial violator than Ms. Rojas was in this case.

She's been punished. Her family has been punished. Her husband has been punished. Imagine that, Your Honor, if we had a case where a woman is being violated for the sins of the husband. In this case, the husband is being penalized for the sins of the wife.

THE COURT: I thought you said his situation has been reversed?

MR. GOLDMAN: This is what -- reversed in this way. The day after this jury came down, finding this misbranding, he got kicked off, get your horses out in 24 hours or 48 hours from Penn National. He had 20 some stalls, so he's a regular presence at Penn National. He could race at Penn National. He could keep his horses at Penn National. The day after her conviction, they took the stalls away from him and said, get your horses out of here, and banned him from Penn National.

We appealed it. They go to the hearing. And they did what the President Judge of the Commonwealth said, and all the courts agreed, was a violation of his due process. They reversed the finding that he violated the regulations and remanded it back, you know, for a new hearing. All while that's being done, he still is banned from Penn National, can't race horses, can't win.

THE COURT: Is that still the situation?

MR. GOLDMAN: He can now race, but they wouldn't give

him his stalls back. And stalls are key. It's an integral part. Stalls are key to a successful operation. They did not give him his stalls back. He can race there. But because he doesn't have any stalls there, he's now, you know, competing up at Presque Isle, a remote location. He's absent from his family. He's got to travel in order to win.

His bread and butter was Penn National. He's lost that. So what we did was, we go back and we go to the racing commission and to Penn National, okay, you can reverse for due process violations, let's have a hearing. The hearing was put off. Then a week before the hearing, where we're going to go in there and make our fight and show that he was violated, and show that they continued to violate his due process rights, they withdrew the charges. And they told us, you don't have a right to a hearing.

I couldn't go in there and say that Penn National violated his rights. They withdrew it and didn't give us our hearing day. And Penn National to this day hasn't given him back his stalls. And they won't give him back his stalls. They say, it's our private property, he's not getting them back. That's all because she was convicted, Your Honor.

Now imagine that. Most cases, the worst thing you can do to somebody is put them in a cinder block cell or a cage. But in this case, wiping out a family, wiping out their finances, I mean, that's penalty by itself. That should -- you

know, I believe this Court has a heart. And variances, you know, are facts that may appeal to the heart.

This is not a case where anything is served but mere punitive efforts, you know, by the Government to incarcerate this woman. And so, Judge, what's being accomplished when everybody else doesn't go to jail? Everybody else continues with their trade? Everybody else continues as a trainer? But they want to take this woman with no prior criminal record and incarcerate her. Why? Because she had the gumption to say, I am legally not guilty in this case, which I believe is something that this noble country and juris prudence, you know, stands for, that a person has a right to say, not to lie, not to deceive on the facts, but to say, I am legally not guilty in this case.

And you know what's really bad in this case and shows you the vindication? I asked Mr. Behe, you'd agree to bail pending appeal? These are substantial issues of law. He goes, no, I want her remanded today. I mean, all we're getting from the Government is a punitive face in this case. And I'll deal with that later because, you know, I'm putting this out now just to show you how vindictive the Government is in this case.

A white collar case, no prior criminal record. She's been convicted for four years, she hasn't fled. She knows what the sentencing guidelines are, she hasn't fled. She's got the misbranding. Have you ever seen a more cockamamie statute in

your life as applied to this case? And we've supplied all the law to say this is a substantial issue of law. Even the Supreme Court says something different than the Government says. And they want her to go to jail today.

So, Your Honor, in this case nothing is served by incarcerating Murray Rojas. If we're wrong, which I don't believe we are, she will stand as convicted. She will have that misbranding. Her life has been ruined. She can't race. She can't race at all. She can't race anywhere. That's enough of a penalty. I mean, where is the message, where is the deterrence, if this lone woman who is arguing for her legal rights is the only one here that gets incarcerated?

This is a case, Your Honor, you know, let us go and fight it out in the Third Circuit on who's right or who's wrong on the misbranding statute. But she doesn't deserve to be sitting in prison a day in this case under these facts.

THE COURT: I'll hear anything else you have to say either on her behalf or before I turn it over to her to exercise her right to speak.

MR. GOLDMAN: She's not going to speak, Your Honor.

THE COURT: Okay.

MR. GOLDMAN: We thank you for that opportunity. She's aware she has that opportunity. Your Honor, respectfully, I believe in the course of this trial, the Court went along with all the arguments made by the Government

practically in this case, which was your prerogative, you thought they were right on their legal arguments. On the motions to vacate, you went along with the Government's arguments, which is your prerogative.

But now it's sentencing. I don't believe it's the role of a sentencing court in the United States, in federal court particularly, to just go along with the Government at sentencing. And I don't believe that it's proper in a case where the Government -- where the appellate courts say and the Supreme Court says you take every individual as a unique person and you only sentence to a sentence that's no greater than necessary to accomplish the goals of sentencing.

In this case, Your Honor, I'm respectfully requesting that you do use your wisdom, use your discretion, and impose a sentence on this very fine woman with an excellent family who does good. Hopefully you read those letters, the character letters. You know, she has been defined by all those who wrote sentencing letters as being a woman who takes care of her horses.

She's been contributing in starting these organizations that save horses that are now too old, you know, to race on our racetracks. And what do all these people say? All the horses that Murray brings to us, she doesn't bring us these horses when the horses are broken down and too damaged to win. Her horses have been turned into dressage horses, jumping

horses, pleasure horses. Other trainers? Glue factory. Meat to Japan or Canada. That's what they do.

That demonstrates that in this case there was no -- as a matter of fact, all the veterinarians say, all the therapeutic drugs, these were all therapeutic drugs that were given to horses and were not for performance. They were for the good of the horse. They were for the good of the horse. She deserves jail under these guidelines?

And so, Your Honor, I'm asking you to use your independence. In this case now at sentencing, use your independence and treat her as an individual, not just being defined by the Government, not just being defined by the sentencing guidelines, and not being defined by, you know, a strange misapplied statute in this case. There is nothing to be accomplished by penalizing her further.

Do you want me to take up the bail issue now?

THE COURT: Go ahead.

MR. GOLDMAN: Your Honor, for purposes of bail on appeal, the Defendant needs to show they're not a risk of flight or danger to the community. Her alleged criminal activity goes back as far as seven years ago. That's something I should have brought up also. What you're sentencing her on today took place five to seven years ago, not recent in time. No allegations more recent than that. Five years ago.

She's known since getting that target letter that she

was going to be indicted. She knew since the indictment she was going to be tried. She's known since sentencing that she's going to be sentenced. She hasn't fled. And these are not crimes which the statutes or law would consider to be, you know, crimes of danger to the public. So she meets that criteria.

The next criteria is whether or not there's substantial questions of law or fact which will likely result in a reversal and order for new trial or a sentence that does not include a term of imprisonment. I have articulated at least 17 issues which meet those criteria.

THE COURT: Anything further before I turn it over to Mr. Behe?

MR. GOLDMAN: Well, I would ask you to consider these. These are all --

THE COURT: At the moment, I don't need to because I intend to have her self-report.

MR. GOLDMAN: Thank you, Your Honor.

THE COURT: And I can make a decision up until that time.

MR. GOLDMAN: Thank you, Your Honor.

THE COURT: Mr. Behe.

MR. BEHE: I think it's important again to start with the 3553(a) factors since that's what guides the Court here. And I think it's important to put aside all of the background

noise accusing prosecutors of Brady violations, ethical violations, somehow manipulating the Court through the trial process to rule in our favor in certain motions in certain ways, adopting our position as if we're some puppet master of the Court.

I don't -- I could never think of making such an argument to the Court that's being made here. But it's important to focus only on what the law is, and that is the 3553(a) factors. And 3553(a) provides that the Court shall impose a sentence that is sufficient but not greater than necessary to comply with the purposes set forth in paragraph 2 of that section.

One of those is that the purpose of the sentence or the need for the sentence imposed is to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. In this case, the evidence shows that the Defendant just completely flaunted the rules and regulations governing how this sport is conducted in Pennsylvania.

She sits here not getting acceptance of responsibility. She's defiant. She says she did nothing criminal. In this particular case, a sentence within the guideline range would, in fact, promote respect for the law, reflect the seriousness of the offense, and provide just punishment.

The second factor is to afford adequate deterrence. A sentence of incarceration would most certainly deter any other trainer or individual so situated if they were thinking of engaging in this type of criminal activity to see that rather than a hundred dollar fine, or a hundred fifty dollar fine, and suspension for a week from the track is the -- that's why everything continued, to show that this, in fact, is a serious violation of federal law designed to protect this industry and would, in fact, deter others who might be thinking of engaging in this criminal conduct.

I would also note that the pre-sentence report contains a victim impact statement from Penn National that says, "On behalf of Penn National Gaming, Inc., and Hollywood Casinos, we would like to state that the criminal actions of Ms. Murray Rojas, as affirmed by this Court, have eroded the public perception of and trust toward our track and company, the billion-dollar horse racing industry in the Commonwealth, and the sport of horse racing in general.

For many years, Ms. Rojas trained and raced extensively at Penn National Race Course and other tracks owned by our company. Ms. Rojas was prominent among the upper echelon of trainers at Penn National, winning multiple training titles by winning the most races in a calendar year. Based on evidence presented during her trial, and the verdict of this Court, the integrity and outcomes of those victories are

tainted.

The public, the industry, and our company have been irreparably harmed by Ms. Rojas' criminal endeavors to win at any cost. Nothing is more important than maintaining the integrity of racing, which includes the ethical treatment of horses. These majestic animals are the heart of the industry and sport and must be treated humanely and not used as tools to further a criminal enterprise. Likewise, there is no industry without an engaged, trusting public.

For more than 45 years, Penn National Race Course has been welcoming families and bettors to its facility to enjoy an evening of entertainment at the races. Ms. Rojas' actions do nothing to lessen the public's skepticism regarding the motives and actions of participants in the sport, leading individuals to lessen, or in many cases divest themselves of, active participation and interest in horse racing.

This impact can have significant and far-reaching economic consequences. The wagering public, whose betting dollars fuel purses and revenues for horsemen and the industry, will seek other alternatives for their entertainment dollars. According to the statistics from the Pennsylvania Gaming Control Board's annual pari-mutuel benchmark report, wagering on Pennsylvania racetracks has declined over 11 percent from 2013 to 2017.

Future investors in race horses may also decide to

allocate their capital to pursuits where they know they will be competing on an even playing field. These losses create a vicious downward spiral that ultimately impacts jobs and the agriculture industry in the Commonwealth and beyond.

We feel strongly that the Court should take every available action at its disposal in the sentencing of Ms. Rojas to show the horse racing community, and the public at large, that such illegal activities will not be tolerated and such individuals face significant consequences should they attempt to go outside the established boundaries of the rules of racing."

With regards to the hardship to the Defendant. As Mr. Rojas has lost 20 stalls, their farm is a mile away from the racetrack. Yes, she isn't allowed to race there, but neither are the vets. The focus is always off of her conduct and what she did and what she has not admitted to. In this particular case, the Defendant was engaged in this criminal activity knowingly and fraudulently and deserves to be sentenced within the advisory guideline imprisonment range for that conduct.

I disagree strongly with Mr. Goldman when he asks that she be released on bail pending appeal. While it says that the Court should -- could release somebody, it starts out by saying that a person who has been found guilty of an offense and sentenced to a term of imprisonment should be detained

unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or to the community and that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in a reversal and order for a new trial or a sentence that does not include a term of imprisonment or a reduced sentence to a term of imprisonment less than the total of the time already served.

This case is not complex. This case is very straight forward, simple, and factually driven. Your Honor looked at all of the evidence, wrote a well-reasoned opinion explaining how this is a very simple straight-forward case --

THE COURT: This Court could be wrong.

MR. BEHE: Well, you would have to make a finding that you are likely to be reversed or that your rulings are likely going to result in a new trial. I don't see anything that would result in a reversal -- I can't predict what would happen. But you would have to make that finding, I will let you out on bail because I think I'm going to be reversed or I think there is going to be a new trial in this case. And I don't see that in this case at all.

There's nothing novel about this fact situation, and there's nothing complex about this statute. Your Honor explained in your opinion that it was pretty straight-forward. The only thing that was making it complex was the Defendant's

interpretation and spin on the law. So with that, I think a sentence within the advisory guideline range would be appropriate.

I know Your Honor is going to allow her to self-report, but I would ask the Court not to permit her to remain free on bail while this appeal is pending for those reasons.

MR. GOLDMAN: Your Honor, brief rejoinder on those comments, particularly the victim impact statement. The reality here is that Penn National got its nose bloodied during this prosecution because it came out that one of their stewards had said that, you know, whatever you're doing, you can continue doing in these cases because the lab results are coming up fine.

It's interesting that all these other trainers who got target letters and were going to get indicted are still racing at Penn National. So Penn National is really concerned about, you know, cleaning up its own business. They say that there is potential financial losses here. There's no evidence that they lost a dime, you know, since the conviction of Murray Rojas that's attributable to Murray Rojas.

Their notion that there's a downward spiral, that's throughout the United States because, you know, people's attitudes changed towards different sports. The horse racing industry does not have the panache that it once had, the game

of kings. It's not present in the United States anymore. You got millennials that could care less about seeing a horse that's racing at a track.

It's a changing climate. It's not driven by Murray Rojas', you know, conviction or the evidence that came out in this case. And it's ridiculous for Penn National, even the Government, to assert that she somehow or other didn't deal humanely with the horses. All the vets testified, I read it this weekend, that everything they did in this case was for the good of the horse, for the health of the horse. There's no evidence about treating these horses inhumanely. So it's ridiculous for Penn National to have even written that letter and make that allegation and also for the Government to argue that to the Court.

And the Government has it totally wrong on the basis for bail on appeal. To say to this Court that you have to find right now, Judge, that you made a mistake and you're going to be reversed as a basis is ludicrous. Because if you believe you had made a mistake, you would have already granted that. That's like saying then in any case, unless a judge is willing to say, I really screwed up, there's a right to bail. That's not what the case law says.

When we're talking about substantial issues of law, you know, one is whether or not, if we're right on appeal, that it would result in no prison time. Well, if I'm right that

it's a misdemeanor offense and not a felony, zero to six months. That meets that criteria.

Is it likely to be reversed? The Court may recall that you permitted the hearsay evidence coming in as far as the bad -- let me give you background here because it's been a while. When they first indicted my client on an X number of races, there wasn't one bad urine test, one bad laboratory test. It wasn't until the second superseding indictment they brought in through hearsay that some of her horses had a positive testing after a race.

The allegation wasn't that those drugs were given on race day, just that they had substances in their body. The United States Supreme Court, you can't bring in laboratory results unless you bring in the chemist. You can't bring these in unless you establish the chain of custody. This Court, at the urging of the Government, permitted the laboratory results coming in, the positive's, without a chemist and without a chain of custody being established.

The Government conceded in the record they no longer had the chemist and they no longer had the barn reports which established chain. That alone is going to lead to reversal in this case, separate and apart from the misbranding statutes. And the issue is whether or not, you know, there is disagreement, legitimate disagreement on the law in the misbranding, dispense versus administer. Supreme Court says

they're different. Mr. Behe says they're the same. I'll put my money on the Supreme Court.

But there's the disagreement there. And so if we're right, and the Supreme Court, you know, if the Third Circuit says the Supreme Court sounds pretty good to me over Mr. Behe, we got a new trial or we got a vacating of the sentence. Each of those 15 are solid grounds for reversal, solid grounds for probationary sentence, serving no time, and not even award of a new trial. Some of those remedies will get us a new trial. Then we'll see.

They wouldn't bring one more prosecution in this case against the other trainers. Are they going to bring another case against Murray Rojas? I doubt it. If they do, we'll win that one. We'll go to trial on misbranding. So this case, this case meets all the criteria. When you go and actually look at Third Circuit law to what the criteria is for a substantial issue of law, there's no case like this that nails every one of the factors that are under consideration.

I would ask you, you say you're not going to -- you say that she can self-report, I guess you're not going to give her probation, you're going to give her a prison sentence. Will you please make a ruling on the bail pending appeal with enough time for me to prepare and file an appeal to the Third Circuit before she's incarcerated? I ask for that courtesy because she should not be sitting one day in jail when we have

all these, you know, strong legal arguments which have been preserved, you know, on the record here, Your Honor.

THE COURT: Anything further from anyone?

MR. BEHE: No, Your Honor, thank you.

THE COURT: I'm going to take a recess for 15 minutes.

COURTROOM DEPUTY: Court's in recess.

(Recess taken at 10:43 a.m. and proceedings reconvened at 11:04 a.m.)

THE COURT: Will counsel and the Defendant approach.

(Complied.)

THE COURT: Anybody have anything further to add? Mrs. Rojas, you do understand you have the right to make a statement on your own behalf? Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: And it's your desire not to, is that correct?

THE DEFENDANT: Yes.

THE COURT: Anyone else?

MR. GOLDMAN: No, Your Honor.

MR. BEHE: No, thank you, Your Honor.

THE COURT: You know, in the 40 years I've been on this bench, this has been a very difficult case. I've listened to all the arguments, and I'll make the following decision.

AND NOW, this 6th day of May, the year 2019, the

Defendant appearing for purposes of sentencing. Pursuant to the Sentencing Reform Act of 1984, and after having considered the factors set forth in 18 U.S.C. Section 3553, it is the judgment of the Court that the Defendant, Murray Rojas, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 27 months. This term consists of terms of 27 months on each of Counts 8 through 21, to be served concurrently.

The Court finds that the Defendant has the ability to pay a fine. It is ordered that the Defendant shall pay to the Clerk, U.S. District Court, the sum of 6400 dollars, consisting of a special assessment of 100 dollars on each count, for a total of 1400 dollars, due immediately, and a fine of 5000 dollars, payable within 30 days.

Upon release from imprisonment, the Defendant shall be placed on supervised release for a term of two years. This term consists of terms of one year on each of Counts 8 through 20 and two years on Count 2, to be served concurrently. Within 72 hours of release from the custody of the Bureau of Prisons, the Defendant shall report in person to the probation office in the district to which the Defendant is released.

While on supervised release the Defendant shall not commit any federal, state, or local crimes, and shall not possess a dangerous weapon. The Defendant shall comply with the standard conditions that have been adopted by this Court

and with the following additional conditions:

One, You must not engage in an occupation, business, profession, or volunteer activity in a horse racing industry without the approval of the probation officer. Two, You must cooperate in the collection of a DNA sample as directed by the probation officer. The Court finds that the Defendant poses a low risk of future substance abuse and, therefore, suspends the mandatory drug testing requirement.

It is further ordered that the Defendant, Murray Rojas, surrender at the institution designated by the Bureau of Prisons before 2 p.m. on 6/3/19. The Defendant is to contact the U.S. Marshals Office no later than three days prior to the above date to be notified of the place of confinement.

The Court makes a record that the Bureau of Prisons usually requires a four-week time span, but that four-week time span would be Memorial Day, and the Court therefore has given an extra week of 6/3/19.

Now the following statement of reasons is placed on the record for the sentence that has been imposed: The Court adopts the pre-sentence investigation report without change. No count of conviction carries a mandatory minimum sentence. The fine is below the guideline range because of the Defendant's inability to pay. The sentence is within the guideline range and the difference between the maximum and minimum of the guideline range does not exceed 24 months. The

Court finds no basis to find for any variance or departure from the guidelines.

Now Mrs. Rojas, you do have the right to appeal your sentence to the Court of Appeals for the Third Circuit. If you are unable to pay the costs of an appeal, you may apply for leave to appeal in forma pauperis. And if approved, counsel will be appointed for you and you will not be required to pay any costs. You may also request our Clerk of Court to prepare and file a notice of an appeal on your behalf. Is there anything --

MR. BEHE: No, Your Honor, nothing else.

MR. GOLDMAN: I have something, Your Honor.

THE COURT: Yes, sir.

MR. GOLDMAN: Your Honor, are you denying bail on appeal?

THE COURT: I am not ready to -- I said --

MR. GOLDMAN: That's fine.

THE COURT: I said I will rule on it. Do you wish to file a response to this or was your response that you made orally?

MR. BEHE: Well, having just been presented in court with that, I wouldn't mind being able to give the Court my view of it.

THE COURT: Can you do that within a week?

MR. BEHE: I have that trial with Your Honor starting

next week. I'll try to -- unless Your Honor doesn't need anything beyond what I've said?

THE COURT: We have -- I can have Wendy transcribe your argument on this matter.

MR. GOLDMAN: I may supplement it with legal argument, Your Honor. Those are the grounds for appeal.

THE COURT: Right.

MR. GOLDMAN: I don't know whether or not the Court is familiar with the legal standard, etc. I'd be glad to assist.

THE COURT: We have our own standards that we think is a bit different than as strictly as you see it.

MR. GOLDMAN: I would hope so.

THE COURT: So it's up to you. I just need to know -- I can have an opinion out this week on this issue.

MR. BEHE: I'd like to be able to file something by the end of the week.

THE COURT: Okay.

MR. GOLDMAN: Can I have two days to respond?

THE COURT: Yes, you may.

MR. GOLDMAN: Thank you, Your Honor.

THE COURT: Court's adjourned.

COURTROOM DEPUTY: Court's adjourned.

(Proceeding adjourned at 11:10 a.m.)

CERTIFICATION

I, Wendy C. Yinger, Federal Official Realtime Court Reporter, in and for the United States District Court for the Middle District of Pennsylvania, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

/s/ Wendy C. Yinger
Wendy C. Yinger, RMR, CRR
U.S. Official Court Reporter
(717)440-1535

(The foregoing of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)